# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | | |
|---|---|---|
| Victoria C. Martinez, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 12 CV 50016 |
| | ) | Magistrate Judge Iain D. Johnston |
| Carolyn W. Colvin, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

The Claimant brings this action under 42 U.S.C. §405(g), seeking reversal or remand of the decision by Respondent, Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"),[1] denying the Claimant's application for disability insurance benefits under Title II of the Social Security Act ("SSA"). This matter is before the Court on cross-motions for summary judgment. Dkt. #16, 19, 20.

The Claimant argues that the Commissioner's decision denying her application for benefits should be reversed or remanded for further proceedings because the Administrative Law Judge's ("ALJ") decision is not supported by substantial evidence and is contrary to law. The Commissioner argues that the ALJ's decision should be affirmed because it is supported by substantial evidence, and no error exists requiring remand. For the reasons set forth more fully below, the Claimant's motion for summary judgment is denied, and the Commissioner's motion is granted.

---

[1] Commissioner Carolyn W. Colvin has been automatically substituted as the Defendant-Respondent pursuant to Federal Rule of Civil Procedure 25(d).

# I. BACKGROUND

A. Procedural History

The Claimant filed an application for disability on September 16, 2009, alleging a disability onset date of June 1, 2009, due to depression and schizophrenia. R. 95, 120.  The application was denied.  R. 9.  The Claimant filed a timely request for a hearing on May 20, 2010. R. 9.  The ALJ conducted a video hearing on October 27, 2010 in Evanston, Illinois.  The Claimant and Vocational Expert James J. Radke testified at the hearing. R. 9.  Counsel represented the Claimant at the hearing. R. 9.

On October 29, 2010, the ALJ issued a decision denying the claim for benefits. R. 6.  On November 10, 2010, the Claimant filed a timely request to review the ALJ's decision. R. 5.  On November 17, 2010, the Appeals Council denied the review, making the ALJ's decision the final decision of the Commissioner. R. 1.  Thereafter, the Claimant filed this appeal pursuant to 42 U.S.C. §405(g).

B. Hearing Testimony

1. Claimant

Counsel represented the Claimant at her hearing on October 27, 2010. R. 27.  At that hearing, Claimant testified that at the time she was thirty-six years old and was a high school graduate. R. 31.

She also testified to her employment during the time she claimed to be disabled.  The Claimant testified that she attempted to work in the fall of 2009, but

was unable to work for more than a day or two because she could not concentrate. R. 31. But the Claimant also testified that since the end of April 2010, she was working about 20 hours per week helping elderly people by preparing light meals for them, providing them medications and cleaning. R. 32. According to the Claimant, she would watch her clients, including one client for five hours. R. 44. She would occasionally cook for him, ensure that he ate breakfast, got dressed and brushed his teeth. R. 45. She also testified to her work at a rehabilitation center, where she serves meals to elderly patients. R. 45. She did not work at the rehabilitation center every day, but when she did, she would work for four hours. R. 45. The Claimant also testified about her work as a school room aide from October 2006 to January 2009. In that position, she supervised the children to ensure that they did not get into trouble. R. 33. From January 2009 to May 2009, the Claimant was a teacher aide, during which time she would help the teacher and worked with physically disabled students. R. 33. None of these positions required or provided full-time work. R. 34.

The Claimant testified that her last full-time employment was in 1994 or 1995 working in a factory. R. 34.

The Claimant testified as to her then current abilities and activities. According to the Claimant, she drove daily and went grocery shopping for her elderly clients and herself. R. 34, 48. She lived with a roommate at a shelter. R. 37. The Claimant testified that she liked to read and did, in fact, read, but could only read short articles because of her inability to concentrate. R. 37. The Claimant

claimed to be not social and would only socialize with her mother, father and brother. R. 47.

Although the Claimant testified that in the past she was a danger to herself, it was not a problem at that time. R. 39 ("There isn't a problem now."). Indeed, the Claimant specifically and repeatedly testified that she was currently stable while on her medication. R. 40 ("Because I'm stable.").

According to the Claimant, since the last time she was suicidal (during the summer of 2009), she was not suicidal when on medications. R. 39, 44. The Claimant testified that in the prior twelve months she was "unstable" two or three times. R. 40. These episodes lasted two or three days, according to the Claimant. R. 41. The Claimant clarified that she was no longer delusional and that the medications she took were affective. R. 44.

The Claimant contends that she cannot work because she cannot concentrate for eight hours a day. R. 34, 39. According to the Claimant, she also has problems remembering. R. 35, 41, 44. The Claimant asserted that her lack of concentration was a result of her medications. R. 35. (At the time, she testified she was taking nine to ten medications. R. 35.) The Claimant admitted that nothing physical was "holding [her] back." R. 41.

The Claimant testified that she was not undergoing formal mental health therapy because her physician did not believe it was required. R. 36.

According to the Claimant, she was diagnosed "with bipolar, schizophrenic disorder." R. 43. The Claimant said that she would become paranoid and believed

that "somebody was watching [her] in the house." R. 43. The Claimant recognized that her physicians gave differing opinions regarding her mental health: one treating physician diagnosed her as bipolar, schizophrenic and another treating physician diagnosed her as only schizophrenic. R. 43.

2. Vocational Expert

A vocational expert ("VE"), James Radke, also testified at the hearing. He testified that the Claimant's work at the rehabilitation center could be classified as a "dietary aide," which was medium, unskilled work. R. 50. According to Mr. Radke, the Claimant was not engaged in substantial gainful employment. R. 50.

The ALJ provided Mr. Radke with a hypothetical residual functional capacity ("RFC") that was more restrictive than the Claimant's then current work. R. 51. The ALJ's hypothetical to Mr. Radke excluded public contact. R. 51. The ALJ's hypothetical assumed that there would be no exertional restrictions of movement but moderate restrictions of mental health functions relating to interacting with others and maintaining concentration, persistence and pace, and that the work would be routine so that there would not be much to re-learn each day. R. 51-2. The ALJ's hypothetical also included the proposition that the Claimant could not perform her past relevant work, and limited the work to unskilled work. R. 52. The ALJ also asked Mr. Radke to assume that the hypothetical claimant could "understand and remember and carry out short instructions after simple demonstration." R. 55. According to Mr. Radke, jobs existed in the economy that this type of person could perform. R. 52.

C. Medical Evidence

The Claimant asserted an onset date of June 1, 2009. However, the medical records extend back to 2003.

The medical records show that the Claimant was taking the following medications: Alprazolam, Serquel, Ambien, Effexer and Geodon. R. 197. The administrative record contains extensive records relating to the Claimant's treatment by Dr. William J. Giakas of Rockford Psychiatric Medical Services, dating between May 29, 2009 to October 21, 2002. These records basically consist of two types of documents: (1) medical progress notes written by either Dr. Giakas or Zella V. Moore, a psychiatric nurse practitioner; and (2) psychiatric symptoms questionnaires (PSQs) completed by the Claimant. Of significant note for this case, the PSQs asked the Claimant to describe various symptoms relating to her mental health. One part of the PSQ contains a series of questions that required the Claimant to rate various symptoms on a scale from zero (0) to ten (10), with a zero meaning "not at all" and a ten meaning "extremely". For example, under the heading of "Concentration Problems," the questionnaire asked the Claimant, "In the past 2 weeks, on average, how much have you suffered from trouble concentrating?" R. 219. A similar question exists for depression. That question asks, "In the past 2 weeks, on average, how much have you suffered from depression?" R. 218. Another part of the PSQ asked the Claimant to indicate "What percentage of your normal mental health are you at now?" and then asked the Claimant to draw a line on an arrow indicating a scale between 100% and 0%. R. 220.

A May 29, 2009, medical record from Dr. Giakas' office indicated that the Claimant was anxious and had paranoid delusional ideation, and provided a diagnosis of "schizoaffective disorder, depressed type." R. 214. But this same record also stated that the Claimant did not demonstrate increased forgetfulness or decreased cognitive ability. R. 214. This document also stated that the Claimant denied hallucinations and delusions. R. 214. An April 30, 2009, record stated that the Claimant possessed a cognitive deficit relating to recall. R. 215. Dr. Giakas had previously diagnosed the Claimant with schizoaffective disorder on April 24, 2003. R. 320.

The medical notes between April 30, 2009 to May 30, 2003 – a time span of nearly six (6) years – consistently and repeatedly stated that the Claimant was doing well, and was stable and euthymic. These notes are dated April 30, 2009; March 23, 2009, February 10, 2009, December 1, 2008, November 7, 2007, October 8, 2007, September 13, 2007, June 7, 2007, March 1, 2007, February 1, 2007, January 3, 2007, October 24, 2006, March 30, 2006, April 20, 2005, October 26, 2004, April 29, 2004, January 9, 2004, November 26, 2003, October 13, 2003, and May 30, 2003. R. 319, 310, 305, 292, 279, 272, 268, 259, 252, 248, 227, 222, 215. These records also consistently and repeatedly state that throughout that same time period the Claimant was not experiencing hallucinations, delusions or suicidal ideations. R. 299, 279, 248, 241, 234, 227, 222.

The PSQs from April 30, 2009 to October 27, 2003 – again a time span of nearly six (6) years – show the following. In response to the question regarding

concentration, the Claimant indicated "markedly" (seven out of ten) on April 30, 2009, and "moderately" on March 23, 2009, as well as "markedly" on October 11, 2005. R. 302, 225, 219. But for *all* the remaining PSQs, the Claimant indicated either "mildly" or "not at all." The Claimant indicated "mildly" (one out of ten) on the following dates: February 10, 2009, December 1, 2008, October 8, 2008, August 7, 2008, April 30, 2008, November 7, 2007, September 13, 2007, March 29, 2007, March 1, 2007, February 1, 2007, January 3, 2007, October 24, 2006, and August 30, 2006. R. 294, 281, 276, 274, 270, 266, 261, 254, 246, 239, 236, 232, 229. On April 20, 2005, November 24, 2003 and October 27, 2003, the Claimant indicated "mildly" by stating the symptoms were three out of ten. R. 316, 313, 308. The Claimant indicated "not at all" on the following dates: June 12, 2008, February 19, 2008, October 8, 2007, August 22, 2006, June 21, 2006 and December 29, 2005. R. 297, 290, 286, 257, 250, 243.

The PSQs from October 27, 2003, to April 30, 2009, show the following. In response to the question regarding depression, the Claimant indicated "moderately" only one time – on October 27, 2003 – nearly six years before the onset date. The remaining twenty six (26) times she indicated either "mildly" – fifteen (15) times – or "not at all" – eleven (11) times. R. 218 – 326.

On the PSQs, during this same time period, the Claimant consistently assessed herself as nearly 100% normal and in good health. R. 309, 303, 295, 287, 282, 271, 267, 262, 258, 255, 251, 244, 230.

The medical records also contain the following pertinent pieces of information.  On June 22, 2006, Dr. Giakas indicated that the Claimant was chronically stable. R. 288.  On November 7, 2005, the Claimant called Dr. Giakas and left a voice mail message stating that she "does not need a psychiatrist any longer." R. 300.  And on April 20, 2005, the Claimant wrote on a PSQ: "I feel perfectly fine." R. 309.

On October 16, 2009, the Claimant's mother completed a third-party report regarding the Claimant. R. 130 – 37.  In this document, the Claimant's mother asserted that the Claimant forgot things easily. R. 131.  The Claimant's mother described the Claimant's typical day as follows:  The Claimant would go to typing class in the morning, and craft class in the afternoon; and she would attend Bible study classes and perform volunteer work. R. 130.  According to the Claimant's mother, the Claimant prepared meals for herself and others, and that as long as the Claimant was taking her medication "she cook[ed] fine." R.132.  This document also indicated that the Claimant did household chores, including raking leaves and shoveling snow and did these activities without encouragement or reminders, provided the Claimant was taking her medication; that the Claimant went shopping for food and clothing; that she was able to pay bills, handle a savings account, count change and use a checkbook. R. 132 – 33.  Her mother indicated that the Claimant enjoyed doing crafts and reading books, so long as the Claimant took her medication. R. 133.  Importantly for purposes of this case and somewhat contrary to the representation that the Claimant forgets things easily, the Claimant's mother

indicated that the Claimant could pay attention "as long as a normal person," provided she took her medication. R. 134.

On December 21, 2009, Dr. John L. Peggau, Psy. D., evaluated the Claimant. R. 424. He noted that the Claimant struggled with and could not complete the serial seven subtraction task from 100, and that she had difficulty recalling information. R. 425. Dr. Peggau noted that the Claimant was not actively psychotic, and that the Claimant said that her medication helped. R. 426. Dr. Peggau diagnosed the Claimant with schizoaffective disorder. R. 426.

On January 8, 2010, non-examining state agency physician Dr. Ronald Havens, Ph.D., completed a review of the Claimant. R. 429. He indicated that an RFC assessment was necessary, and also noted the Claimant's schizophrenia and affective disorders. R. 429. Dr. Haven noted that the Claimant previously had hallucinations or delusions, and relying upon the consulting examination and medical records, noted that the Claimant's disorder was in remission. R. 431. He found that a "medically determinable impairment [was] present that [did] not precisely satisfy the diagnostic criteria;" namely, depression and depressive disorder. R. 432. Under the "B" criteria, Dr. Haven found that the Claimant had moderate limitations for restriction of activities of daily living, difficulties in maintain social functioning, and difficulties in maintaining concentration, persistence, or pace. R. 439. He also found that no episodes of decompensation existed. R. 439. Dr. Haven found that there was no evidence establishing the presence of the "C" criteria. R. 440. Dr. Haven concluded his review by identifying

the sources of information upon which he relied, including Dr. Giakas' records, Dr. Peggau's consulting report, the Claimant's report and her mother's report. R. 441. He concluded by noting that an assessment of the Claimant's functional limitations indicated that her impairments did not interfere with her functions to such an extent that she met or equaled a listing. R. 441.

Dr. Havens also completed a mental RFC assessment. R. 443. He found that the Claimant was *moderately* limited in the following functions: the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to work in coordination with or proximity to others without being distracted by them; the ability to make simple work-related decisions; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; the ability to respond appropriately to changes in the work setting; and the ability to set realistic goals or make plans independently of others. R. 443-44. Dr. Havens did *not* find any markedly limited functions. Dr. Havens concluded by providing the following functional capacity assessment:

> Although AOX3 capacities and her psychotic symptoms are stable and controlled [with] medications, her mental capacities are somewhat limited.

Accordingly, claimant would have difficulty with detailed assignments although she can understand and remember well enough to engage in simple assignments on a sustained basis. Claimant also can concentrate and persist adequately enough to perform repetitive, routine tasks. Claimant reports that she is paranoid, and although she can relate to others in her shelter somewhat and related well at [the examination], she remains paranoid or suspicious and tends to be withdrawn, lacking the emotional capacity required to interact appropriately with others during more than brief and superficial contact. She should not be expected to deal with the public or to work closely with others. Claimant can adjust to minor routine changes in a routine work environment.

R. 445.

The record also contains medical records from the Crusader Clinic. Progress notes from September 2, 2010, August 5, 2010, June 28, 2010, April 8, 2010, December 17, 2009, and October 30, 2009 all state that the Claimant was "doing well," "feeling good" or "doing better." R. 466, 459; 470, 483, 491.

## D. ALJ's Decision

First, the ALJ found that the Claimant had not engaged in substantial gainful activity since September 15, 2009. R. 11. Although the Claimant worked after she filed her application, the ALJ found that the work activity did not rise to the level of substantial gainful activity. R. 11. Second, the ALJ found that the Claimant was severely impaired by schizoaffective disorder. R. 11. Although the Claimant was obese, her attorney acknowledged that this impairment was not severe. R. 11, 51. The Claimant also apparently suffered from hypothyroidism, but the ALJ found that this impairment was not severe. R. 11. The Claimant's obesity and hypothyroidism are not at issue on this appeal. Third, the ALJ found that the Claimant's impairment did not meet or equal one of the listed impairments.

Fourth, the ALJ determined the Claimant's RFC. According to the ALJ, the Claimant could "perform a full range of work at all exertional levels but subject to the following nonexertional limitations: no public interaction or team coordination; and the work must be routine, the same from day to day, with little to relearn." R. 12. Fifth, the ALJ found that the Claimant possessed no past relevant work. Next, the ALJ found that the Claimant was defined as a "younger individual" when the application was filed, had a high school education and could communicate in English. R. 15. Furthermore, the ALJ found that jobs existed in significant numbers in the national economy that the Claimant could perform. R. 16. Therefore, the ALJ concluded that the Claimant was not under a disability. R. 16.

## II. LEGAL STANDARDS

### A. Standard of Review

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing. 42 U.S.C. §405(g). This much is clear regarding the standard of review. If supported by substantial evidence, the Commissioner's factual findings are conclusive. 42 U.S.C. §405(g). If the Appeals Council denies a request for review, the ALJ's decision becomes the Commissioner's final decision, reviewable by the district court. *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000). But beyond these axiomatic statements, the courts have provided seemingly conflicting guideposts.

At one end of the spectrum, court opinions have held that the standard of review is narrow. *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (review is

"extremely limited"). The district court's review is limited to determining whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the correct legal standard in reaching the decision. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009); *Schoenfeld v. Apfel*, 237 F.3d 788, 792 (7th Cir. 2001). Substantial evidence exists if there is enough relevant record evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Indeed, on review, the courts will give the decision a commonsensical reading and not pick nits. *Rice v. Barnhart*, 389 F.3d 363, 369 (7th Cir. 2004). Moreover, a decision need not provide a complete written evaluation of every piece of testimony and evidence. *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). If reasonable minds could differ concerning whether a claimant is disabled, then the court must affirm so long as the decision is adequately supported. *Elder*, 529 F.3d at 413.

At the other end of the spectrum, courts, including the Seventh Circuit, have been careful to emphasize that the review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). For example, a "mere scintilla" is not substantial evidence. *Id.* Moreover, a reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). If the Commissioner's decision lacks

evidentiary support or adequate discussion of the issues, then the court must remand the matter. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Indeed, even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008).[2] And, unlike most civil litigation in which a decision can be affirmed on any basis in the record, federal courts cannot do so in Social Security appeals. *Compare Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) ("[T]he *Chenery* doctrine . . . forbids an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced.") *with Brosted v. Unum Life Ins. Co.*, 421 F.3d 459, 467 (7th Cir. 2005) ("[W]e can affirm on any basis in the record"). Therefore, the Commissioner's counsel cannot build for the first time on appeal the necessary accurate and logical bridge. *See Parker*, 597 F.3d at 925; *Toft v. Colvin*, No. 08 C 2861, 2013 U.S. Dist. LEXIS 72876, *21 (N.D. Ill. May 23, 2013) ("[T]he court's review is limited to the reasons and logical bridge articulated in the ALJ's decision, not the post-hoc rational submitted in the Commissioner's brief."). An

---

[2] To further show the seeming conflict, scores of cases rely upon the "logical bridge" analysis and language to remand decisions to the Commissioner. *See, e.g. Shauger v. Astrue*, 675 F.3d 690, 697-98 (7th Cir. 2012); *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011); *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). But the "logical bridge" analysis was never meant to compel a hypercritical approach. *Mueller v. Astrue*, 860 F. Supp. 2d 615, 619 (N.D. Ill. 2012). Indeed, the Seventh Circuit has provided the following pedestrian explanation of how an ALJ's decision establishes a logical bridge: "[T]he ALJ must rest its denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade." *Berger*, 516 F.3d at 544; *see also Dixon v. Colvin*, 2014 U.S. Dist. LEXIS 10607, *21—22 (N.D. Ill. 2014) ("The ALJ need not build the Pont Neuf. A simple covered bridge will suffice so long as it allows the reviewing judge to traverse safely the divide between the evidence and the conclusions.").

exception to the *Chenery* doctrine is the harmless-error doctrine, which allows a court to affirm if the outcome on remand is foreordained. *See Osmani v. INS,* 14 F.3d 13, 15 (7th Cir. 1994) (harmless error does not require remand "when it is clear what the agency's decision has to be"); *Sahara Coal Co. v. Office of Workers' Compensation Programs*, 946 F.2d 554, 558 (7th Cir. 1991); *see also Parker*, 597 F.3d at 924. In this process, the court looks to record evidence to see if it can predict with great confidence that the result on remand would be. *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011).

## B. Disability Standard

Disability insurance benefits are available to a claimant who can establish that she is under a "disability" as defined in the SSA. *Liskowitz v. Astrue*, 559 F.3d 736, 739-740 (7th Cir. 2009). "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). An individual is under a disability if she is unable to perform her previous work and cannot, considering her age, education and work experience, participate in any gainful employment that exists in the national economy. 42 U.S.C. §423 (d)(2)(A). Gainful employment is work usually done for pay or profit, regardless of whether a profit is realized. 20 C.F.R. §404.1572(b).

The ALJ uses a five-step analysis to determine whether a claimant is disabled. 20 C.F.R. §404.1520(a)(4)(i – v). Under this analysis, the ALJ must

inquire in the following order: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's severe impairment meets or equals a listed impairment; (4) whether the claimant can perform past relevant work; meaning whether the claimant can still work despite the claimant's physical and mental limitations, which is referred to as the claimant's RFC; and (5) whether the claimant is capable of performing work in light of the claimant's age, education and work experience. *Id.*; *see also Liskowitz*, 559 F.3d at 740. After the claimant has proved that she cannot perform her past relevant work due to the limitations, the Commissioner carries the burden of showing that a significant number of jobs exist in the national economy that the claimant can perform. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

## III. DISCUSSION

A. Contentions of the Parties

The Claimant's arguments as to why the case should be remanded are undeveloped, maddeningly disorganized and extremely difficult to discern, not to mention, replete with typographical and syntax errors. For example, the Claimant argues in two bold typed headings that the ALJ "weighed the state agency residual functional capacity more heavily than both treating and consulting sources." But nowhere – anywhere – in the text of the brief does the Claimant make, let alone, develop this argument.[3] Instead, under those headings, the Claimant *appears* to

---

[3] The Commissioner rightly raised this point in her brief. In reply, the Claimant merely responded by stating, in total, the following: "Well, it's right in the language of the ALJ's decision, although not explicitly stated as such." Dkt. #20, p. 1. As discussed later, this

argue that the ALJ should have found that one of her severe impairments was depression, and analyzed her case under Section 12.04. Dkt. #16, p. 4. Next, under those same headings, the Claimant argues that the inclusion of certain boilerplate language in the ALJ decision requires reversal. Dkt. #16, p. 6 – 7. Finally, under those same headings, the Claimant argues that the ALJ's RFC was erroneous in assuming that the Claimant could perform "simple, routine work" when she had "significant problems of concentration, persistence and pace." Dkt. #16, p. 8 – 9. The Claimant's second argument heading states the following: "The ALJ failed to have a psychologist or psychiatrist to testify at the claimant's hearing." Dkt. #16, p. 4, 9. The Claimant then perfunctorily asserts in nine lines of text her assumption that the ALJ must have "invade[d] the medical province." [4] Dkt. #16, p. 10.

The Commissioner, not surprisingly, disagrees with these contentions and argues that the Claimant's arguments are waived because they are undeveloped and perfunctory. Dkt. #19, p. 3. In reply to the Commissioner's waiver argument, the Claimant only responds with the following two lines: "How in the world can this argument be waived – it's not perfunctory and underdeveloped! If one traces, or attempts to, the ALJ's reasoning, one sees that is exactly what he did." Dkt. #20, at p. 1. This reply "argument" is even more perfunctory and undeveloped than the

---

type of unhelpful, undeveloped, simple contradiction results in forfeiture. And, as also explained later, the Claimant's argument is flat out wrong.

[4] The Claimant cites her GAF score twice, without much discussion, but seemingly as a trump card to establish that she was disabled. Dkt. #16, p. 9. The Court rejects this attempt to overemphasize the Claimant's GAF score of 55, which shows moderate limitations. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (GAF score may be useful for planning treatment but does not reflect the clinician's opinion of functional capacity); *Stites v. Colvin*, No. 12-3155, 2013 U.S. Dist. LEXIS 89598, *34 (C.D. Ill. June 26, 2013).

Claimant's opening brief. These types of arguments are forfeited. *Jarrard v. CDI Telecommunications, Inc.*, 408 F.3d 905, 916 (7th Cir. 2005) (perfunctory and undeveloped arguments that are unsupported by pertinent authority are forfeited on appeal). Not only has the Claimant forfeited arguments by not developing them in her opening brief, but she has also forfeited the arguments by not adequately responding to the Commissioner's waiver argument in her reply brief.

Moreover, the Court is compelled to address the "merits" of the "arguments" in the Claimant's reply brief. First, the Court notes that parties should not view judges as bloodhounds who are merely given a whiff of an argument and then expected to search the record high and low in an effort to track down evidence to locate and capture a party's argument. *Gutierrez v. Kermon*, 722 F.3d 1003, 1012 n.3 (7th Cir. 2013) ("[J]udges are not like pigs, hunting for truffles buried in briefs . . . or records."). Second, merely contradicting an opposing party's developed argument with a single, unsupported sentence is not an argument. Monty Python, *The Argument Clinic*, www.montypython.net/scripts/argument.php; http://www.youtube.com/watch?v=kQFKtI6gn9Y ("[A]n argument is a collective series of statements to establish a definite proposition . . . Argument is an intellectual process. Contradiction is just the automatic gainsaying of anything the other person says."); *see Martinez-Burgos v. Guayama Corp.*, 656 F.3d 7, 9 n. 3 (1st Cir. 2011). And including an exclamation point does not make a cryptic sentence an argument or provide the Court with further analysis.

Social Security appeals are a serious business. Claimants are often destitute and suffering from severe mental and physical impairments. Indeed, without question, the Claimant in this case suffers from a severe mental illness. R. 11. The Court has sympathy for the Claimant's situation. The decision regarding benefits can have life-changing effects on claimants. Accordingly, as required by Seventh Circuit precedent, this Court carefully examines the record and ALJ decision in all appeals. But not all claimants – even those with severe impairments – are entitled to benefits, a fact counsel should recognize and explain to their clients, rather than file meritless appeals and unacceptable briefs. *Central States, et al. v. Lewis*, No. 13-2214 (7th Cir. March 12, 2014); *Triplett v. Colvin*, No. 12 C 4382, 2013 U.S. Dist. LEXIS 166974, *37 (N.D. Ill. Nov. 25, 2013).

The Court has spent a considerable amount of time attempting to discern the Claimant's cryptic contentions. Those contentions are addressed below.

However, before addressing each contention, it is important to consider the overall record as it relates to these contentions. An ALJ may not ignore evidence in the record but neither can a claimant's attorney. *Poremba v. Colvin*, No. 11 CV 50091, 2014 U.S. Dist. LEXIS 73, *49 (N.D. Ill. Jan. 2, 2014). This is particularly true when a claimant bears the burden of proof. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004) (claimant has burden in steps one through four). The following is a small example of the compelling record evidence that the Claimant failed to even acknowledge:

- Dr. Haven's RFC, which is the only medical RFC in the record. R.445.

- The Claimant's sworn hearing testimony that she was stable. R. 40.

- The Claimant's own evaluations, spanning nearly six (6) years, regarding concentration and depression. R. 218 - 326.

- The Claimant's own statement that she was "perfectly fine." R. 309.

- The voluminous medical notes from the Claimant's treating physician that she was stable and not suicidal or suffering from hallucinations or delusions. R. 222, 227, 234, 241, 248, 279, 299.

- The voluminous medical records showing that from October 2009 through September 2010, the Claimant was "doing well," "feeling good," and "doing better." R. 459, 466, 470, 483, 491.

- The Claimant's mother's report stating that the Claimant could pay attention as long as a normal person provided the Claimant took her medication. R. 134.

- The Claimant's ability to work two different jobs after the alleged onset date, albeit not a sufficient level to meet the standard of substantial gainful employment. R. 32, 33, 45.

- The Claimant's testimony that she was *not* undergoing formal mental health therapy because her physician did not believe it was necessary. R. 36.

Standing alone, any one of these points would be important to address. But collectively these points, which were relied upon by the ALJ, R. 13 – 14, present voluminous substantial evidence in support of the Commissioner's decision. Any

chance to overcome this substantial evidence was missed by the Claimant's undeveloped briefs.

The Court stresses that having reviewed the entire record it is clear that the ALJ did not cherry pick the medical records, looking for evidence contrary to the Claimant's allegations. *Poremba*, 2014 U.S. Dist. LEXIS 73 at *46 (ALJ did not cherry pick record). Instead, the record presented shows consistent evidence of the Claimant's stability. *Triplett*, 2013 U.S. Dist. LEXIS 166974 at *24 ("But the ALJ here did not merely mine the record for a few isolated gems of good cheer. The notes . . . are a vein of consistent reports of mental stability without any complaints.").

B. Analysis

1. The ALJ Did Not Err by Allegedly Weighing the State Agency RFC More Heavily than Both the Treating and Consulting Medical Providers.

As noted above, the Claimant has forfeited this argument. *Jarrad*, 408 F.3d at 916. She merely made her contention in two headings and then never discussed the contention. But even if the Claimant had not forfeited this argument, a review of the record establishes that the contention is meritless for at least two reasons. First, neither the Claimant's treating physician, Dr. Giakas, nor the consultant, Dr. Peggau, provided any RFC. Second, because these providers did not provide any RFC, the ALJ could not – as a matter of simple logic – have weighed the state agency RFC more heavily. The only RFC in the record is Dr. Haven's. R. 445. The ALJ did not err by relying upon that RFC in conjunction with the record evidence.

2. The ALJ Did Not Err by Not Conducting a Section 12.04 Listing Analysis.

As noted above, the Court has had difficulty deciphering the Claimant's muddled argument regarding Listing 12.04. The best interpretation of the Claimant's argument in this regard is that because she was diagnosed with depression, the ALJ should have conducted an analysis under Section 12.04. The entirety of the Claimant's argument on this point consists of the following single sentence: "Quite simply the case law is clear that the ALJ in this case was obliged to discuss the Listings for all medical determinable severe impairments."[5] Dkt. #20, p. 2. The Claimant failed to cite any legal support for this proposition and did not develop the point any further.

The Court rejects this argument for three reasons. First, the argument is forfeited. *Jarrad*, 408 F.3d at 916. The Claimant does not cite a single statute, regulation or case to support her contention. Further, her contention is undeveloped by any analysis. One would think that after the Commissioner asserted waiver in the response brief, the Claimant would have bolstered her contention with support and analysis in her reply brief. The Claimant failed to do so; instead her reply was even more cursory.

Second, the Claimant bears the burden of proof on this issue. *Young*, 362 F.3d 1000. She has failed to meet her burden. Initially, the Claimant's sentence in her reply brief is based on the assumption that her depression was "severe." But whether an impairment is "severe" depends on the record evidence, not an

---

[5] The Court finds it interesting that the Claimant asserts that the ALJ was "obliged to discuss" an issue in briefs that are devoid of discussion.

assumption. The Social Security regulations identify how an impairment is severe. For an impairment to be "severe," the impairment must *significantly limit* the claimant's physical or mental ability to do *basic work activities*. 20 C.F.R. §404.1520(c) (emphasis added). Another regulation states the same principle but in the negative: "An impairment . . . is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §404.1521(a). The regulations define "basic work activities" to "mean the abilities and aptitudes necessary to do most jobs," and then provides the following examples (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) using judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting. 20 C.F.R. §404.1521(b)(1 − 6). The Claimant failed to present sufficient evidence showing that her depression was "severe" as defined by the regulations. Indeed, the Claimant failed to even cite the regulations relating to whether an impairment is severe, let alone address these regulations. Moreover, at the hearing, the Claimant repeatedly stressed that her impairment related to her alleged lack of concentration, which she asserted (without any medical evidence in support) was caused by her medications. R. 44; 39-40. The Claimant was represented at the hearing by the same counsel who represents her on appeal. Her counsel had a full opportunity to develop the facts to show that her depression was severe, but he failed to do so. *See Pendleton v.*

*Astrue*, No. 10 C 4587, 2011 U.S. Dist. LEXIS 35314, *26 (N.D. Ill. Mar. 28, 2011) (a court and an ALJ are entitled to assume that a represented claimant has put her best foot forward in making the strongest case for benefits) (*citing Glenn v. Secretary of Health & Human Services*, 814 F.2d 387, 391 (7th Cir. 1987)). Moreover, the Claimant's own answers to the PSQs are contrary to a finding that her depression was a severe impairment. R. 218 – 326. Further, the Claimant admitted that although she claimed to have attempted suicide long ago, her medications resolved that problem. R. 39 ("There isn't a problem now.").

Third, even if the ALJ erred by failing to address Listing 12.04, then that error was harmless. Based upon the record evidence, including the evidence the Claimant has ignored on appeal, the Court has great confidence that if this matter were remanded, the result would be the same. *See McKinzey*, 641 F.3d at 892; *Mueller v. Astrue*, 860 F. Supp. 2d 615, 638-39 (N.D. Ill. 2012) (noting that it is harmless error not to address a limitation when the record supports an ALJ's RFC finding). As noted above, this record evidence includes the Claimant's work she was performing at the time. *See Berger*, 516 F.3d at 546 ("[T]he fact that [claimant] could perform some work cuts against his claim that he was totally disabled."). Were the Court to remand this matter, the Claimant's reported part-time work in conjunction with all the record evidence would result in a denial of benefits.

3. The ALJ's Inclusion of Boilerplate Does Not Require Remand.

Through unartful cutting and pasting, the Claimant notes that the ALJ's opinion contains certain boilerplate language that the Seventh Circuit has disapproved. Namely, the ALJ's opinion states the following:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

R. 13

However, the Claimant offers no argument as to how the inclusion of this boilerplate harmed her or requires remand. As the Commissioner noted, the mere incantation of the Seventh Circuit's strong and repeated disapproval of this boilerplate language does not automatically result in remand. *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012). The inclusion of this inappropriate boilerplate can be harmless if the ALJ otherwise adequately explains his conclusion. *Id.* In this case, after the ALJ's inclusion of the disapproved boilerplate, the ALJ provided a detailed explanation, consisting of nearly three pages of single lined text citing to substantial record evidence supporting the analysis. Among other things, the ALJ noted the Claimant's mother's Third Party Function Report, the Claimant's treating psychiatrist's progress notes from 2002 to 2009, the Claimant's admissions that she was "feeling quite well," the Claimant's responses to the PSQs, the medical records stating that the Claimant was "doing well overall," the consultative examination of Dr. Peggau, the medical records from Crusader Clinic from 2010 that showed a

continued absence of psychosis, the Claimant's then-current work, and Dr. Haven's RFC. R. 13 – 15.

In reply to the Commissioner's harmless error argument, the Claimant simply states only the following: "The problem here is use of daily activities to demean credibility." Dkt. #20, p. 2. There are a number of problems with this reply. Initially, a single sentence is not much of a reply. Moreover, ALJs can, in fact, consider a claimant's daily activities in determining credibility. *Peppers*, 712 F.3d at 368. Furthermore, the ALJ's opinion did not merely rest on the Claimant's daily activities. Instead, the ALJ relied on the avalanche of evidence described above – all of which was ignored by the Claimant.

4. The ALJ's RFC Was Not Erroneous.

The Claimant's entire assertion that the ALJ's hypothetical to the VE resulted in an improper RFC is based upon *O'Connor-Spinner v. Astrue*, 627 F.3d 614 (7th Cir. 2010). In *O'Connor-Spinner*, the claimant had moderate restrictions that affected her concentration, persistence and pace. *Id*. 617-18. However, the ALJ's hypothetical failed to include these moderate restrictions as to concentration, persistence and pace. *Id*. Indeed, the hypothetical in that case never used the words concentration, persistence or pace. Instead, the hypothetical sloppily restricted the claimant to "routine, repetitive tasks with simple instructions." *Id*. The Seventh Circuit then identified and discussed other cases in which it found that the failure to specifically include moderate restrictions as to concentration, pace and persistence was not necessarily fatal to the hypothetical given to the VE. *Id*. 619-

21.  The Seventh Circuit ruled, "[F]or most cases, the ALJ should refer expressly to limitations on concentration, persistence and pace in the hypothetical in order to focus the VE's attention on these limitations and assure reviewing courts that the VE's testimony constitutes substantial evidence of the jobs a claimant can do." *Id.* at 620-21.  The Seventh Circuit's reasoned that "limiting a hypothetical to simple, repetitive work does not necessarily address deficiencies of concentration, persistence and pace." *Id.* at 620.

In this case, the following is undisputed.  First, Dr. Haven's RFC found that the Claimant possessed moderate restrictions as to concentration, persistence and pace. R.445.  Second, the ALJ specifically incorporated those restrictions into the hypothetical given to VE Radke.  R. 51.  Third, at the hearing, the ALJ stated the hypothetical as follows: "Well, then we're going to up to now, Mr. Radke.  Let's assume no exertional restrictions for the movement.  But the State referred to what I call *moderate restrictions of mental health functions as far as interacting with others, maintaining concentration, persistence and pace.*  They're saying she shouldn't deal with the public although it seems like she's working with other people.  Nevertheless go ahead and assume that the work we're talking about should exclude public contact and public interaction or team coordination.  Assume that the work is basically going to be routine so that there is not a lot for her to have to re-learn every day.  It stays the same day to day.  This represents an actually accurate profile for Ms. Martinez.  You're going to explain to me that she's not doing any past relevant – there is no past relevant work.  You're going to

basically have to find some unskilled jobs in the regional Illinois economy. What are those?" R. 51-2 (Emphasis added.). Accordingly, the ALJ's hypothetical to VE Radke expressly referred to the Claimant's moderate limitations as to concentration, persistence and pace. R. 51.

Because the ALJ's hypothetical to the VE – which incorporated the only medical RFC in the record – expressly referred to the Claimant's moderate limitations as to concentration, persistence and pace, *O'Conner-Spinner* is simply not applicable.

The Commissioner's brief made this point clearly. In the Claimant's reply brief, she simply ignored the obvious and merely argued "a moderate restriction in concentration, persistence, or pace, does not necessarily equate with simple, unskilled work." Dkt. #20, p. 2. The point of *O'Connor-Spinner* is that ALJ's should expressly refer to moderate limitations on concentration, persistence and pace. *Olson v. Colvin*, No. 13 C 0015, 2014 U.S. Dist. LEXIS 9551, *2 (E.D. Wis. Jan. 27, 2014). The ALJ did that here. The Claimant cannot simply proceed as those that fact does not exist.[6]

---

[6] Moreover, even *O'Connor-Spinner* recognized and let stand the Seventh Circuit's earlier decision in *Johansen v. Barnhart*, 314 F.3d 283 (7th Cir. 2002). In *Johansen*, the ALJ relied upon the only medical RFC in formulating the hypothetical, just as in this case. *Johansen*, 314 F.3d at 288-89. And Dr. Haven's medical RFC states that the "Claimant also can concentrate and persist adequately enough to perform repetitive, routine tasks." R. 445. When the hypothetical is formulated on the medical expert's opinion that incorporates the concepts of repetitive, routine tasks to address the limitations as to concentration, persistence and pace, the concerns raised by *O'Connor-Spinner* are addressed. *Dixon*, 2014 U.S. Dist. LEXIS 10607 at *34-35. Moreover, as the *O'Connor-Spinner* opinion noted, in *Johansen*, the hypothetical was formulated in a way that excluded the stressors that limited the claimant's concentration, persistence and pace, just as in this case. *O'Connor-Spinner*, 627 F.3d at 619. The point of *O'Connor-Spinner* is that the ALJ's language used in the hypothetical must reflect all the limitations that the claimant possesses. *Coleman v.*

5. The Failure to Call a Psychologist or Psychiatrist to Testify Was Not Error.

Although distinct, this argument is related to the Claimant's RFC argument. This argument likewise lacks merit. According to the Claimant "a medical expert . . . was necessary to provide an informed basis for determining whether the claimant was disabled," citing *Green v. Apfel*, 204 F.3d 780 (7th Cir. 2000). Without any explanation, the Claimant then asserts that "the ALJ had to invade the medical province when he chose the hypothetical that the Plaintiff could sustain an 8 hour day, rather than a 4 hour day as he later questioned the vocational expert." Dkt. #16, p. 10.[7]

An ALJ should call a medical expert only if necessary. *Holladay v. Bowen*, 848 F.2d 1206, 1209-10 (11th Cir. 1988); *Richardson v. Astrue*, No. 11 CV 01002 DML, 2012 U.S. Dist. LEXIS 138240, *26 – 28 (S.D. Ind. Sept. 26, 2012) (no error in failing to call medical expert when no showing that the ALJ disregarded evidence or failed to explain reasoning). For example, a medical expert would be required if no medical evidence existed regarding the RFC. *Manso-Pizarro v. Secretary of Health and Human Services*, 76 F.3d 15, 19 (1st Cir. 1996). Indeed, in *Green*, the ALJ

---

*Colvin*, No. 13 CV 216 BBC, 2014 U.S. Dist. LEXIS 30423, *15 (W.D. Wis. Mar. 10, 2014). That was done here. *See Renly v. Colvin*, No. 13 CV 242 BBC, 2014 U.S. Dist. LEXIS 28690, *6 – 7 (W.D. Wis. Mar. 6, 2014) (finding no error in hypothetical that limited claimant to "routine and repetitive tasks that do not require more than occasional public contact or more than occasional contact with coworkers").

[7] The Claimant then simply string cites the following cases: *Black ex rel. Wolfe v. Barnhart*, 331 F.3d 565 (7th Cir. 2003); *Schmidt v. Sullivan*, 914 F.2d 117 (7th Cir. 1990) and *O'Connor-Spinner*, 627 F.3d 614. For the same reasons explained previously, *O'Connor-Spinner* is distinguishable. Moreover, unlike this case, the ALJ in *Black ex rel. Wolfe* relied on a hunch and also failed to meet the logical bridge standard. In *Sullivan*, the ALJ rejected the treating physician's opinion when no contrary evidence existed, which is very different from this case.

decided the RFC without any apparent medical opinion. *L.C.S. v. Astrue*, No. 1:11 CV 00251 SEB, 2012 U.S. Dist. LEXIS 126659, *31-32 (S.D. Ind. Sept. 6, 2012). Accordingly, when an ALJ relies on a state agency psychiatrist to support the RFC, the holding of *Green* is not applicable. *X.A.D. v. Astrue*, No. 1:11 CV 00753 SEB, 2012 U.S. Dist. LEXIS 140347, *23 – 24 (S. D. Ind. Sept. 28, 2012); *see also Naber v. Shalala*, 22 F.3d 186, 189 (8th Cir. 1994).

As shown above, substantial evidence supported the ALJ's RFC determination. Indeed, the ALJ's RFC determination was based upon Dr. Havens' RFC, which is the only medical RFC in the record. R. 445. The ALJ was entitled to consider and rely upon this RFC when it was supported by substantial evidence, thereby making a medical expert unnecessary under the facts of this case.

Simply asserting that the ALJ must have "invade[d] the medical province" is insufficient. The Claimant was required to present evidence that it was *necessary* for the ALJ to call a medical expert. *Skinner v. Astrue*, 478 F.3d 836, 844 (7th Cir. 2007) (particularly in counseled cases, the claimant bears the burden to introduce objective evidence that the ALJ should have developed the record further)

## IV. CONCLUSION

Claimants should not be tempted to believe that they can win social security appeals by simply filing a document containing canned concerns such as the alleged lack of a logic bridge, the improper inclusion of boilerplate language in an ALJ opinion and an ALJ's alleged failure to develop a record. An appeal needs to possess real analysis and argument supported by record evidence. The Claimant's appeal

possessed none of these. Based on the record and the Claimant's briefs, the Court could have summarily affirmed. But because of the serious ramifications that befall claimants whose applications for benefits are denied, the Court believed that a full explanation of the record and its reasoning would be more appropriate. The Court does not belittle the Claimant's severe impairment. But a severe impairment does not automatically result in benefits.

For the reasons stated above, the Claimant's motion for summary judgment is denied, and the Commissioner's motion for summary judgment is granted.


It is so ordered.


Entered: March 28, 2014

**Iain D. Johnston**
**U.S. Magistrate Judge**